# SUPREME COURT OF THE UNITED STATES

## ANDREW KISELA *v.* AMY HUGHES

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17–467.  Decided April 2, 2018

PER CURIAM.

Petitioner Andrew Kisela, a police officer in Tucson, Arizona, shot respondent Amy Hughes. Kisela and two other officers had arrived on the scene after hearing a police radio report that a woman was engaging in erratic behavior with a knife. They had been there but a few minutes, perhaps just a minute. When Kisela fired, Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so. The question is whether at the time of the shooting Kisela's actions violated clearly established law.

The record, viewed in the light most favorable to Hughes, shows the following. In May 2010, somebody in Hughes' neighborhood called 911 to report that a woman was hacking a tree with a kitchen knife. Kisela and another police officer, Alex Garcia, heard about the report over the radio in their patrol car and responded. A few minutes later the person who had called 911 flagged down the officers; gave them a description of the woman with the knife; and told them the woman had been acting erratically. About the same time, a third police officer, Lindsay Kunz, arrived on her bicycle.

Garcia spotted a woman, later identified as Sharon Chadwick, standing next to a car in the driveway of a nearby house. A chain-link fence with a locked gate separated Chadwick from the officers. The officers then saw another woman, Hughes, emerge from the house carrying a large knife at her side. Hughes matched the description

of the woman who had been seen hacking a tree. Hughes walked toward Chadwick and stopped no more than six feet from her.

All three officers drew their guns. At least twice they told Hughes to drop the knife. Viewing the record in the light most favorable to Hughes, Chadwick said "take it easy" to both Hughes and the officers. Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife. The top bar of the chain-link fence blocked Kisela's line of fire, so he dropped to the ground and shot Hughes four times through the fence. Then the officers jumped the fence, handcuffed Hughes, and called paramedics, who transported her to a hospital. There she was treated for non-life-threatening injuries. Less than a minute had transpired from the moment the officers saw Chadwick to the moment Kisela fired shots.

All three of the officers later said that at the time of the shooting they subjectively believed Hughes to be a threat to Chadwick. After the shooting, the officers discovered that Chadwick and Hughes were roommates, that Hughes had a history of mental illness, and that Hughes had been upset with Chadwick over a $20 debt. In an affidavit produced during discovery, Chadwick said that a few minutes before the shooting her boyfriend had told her Hughes was threatening to kill Chadwick's dog, named Bunny. Chadwick "came home to find" Hughes "somewhat distressed," and Hughes was in the house holding Bunny "in one hand and a kitchen knife in the other." Hughes asked Chadwick if she "wanted [her] to use the knife on the dog." The officers knew none of this, though. Chadwick went outside to get $20 from her car, which is when the officers first saw her. In her affidavit Chadwick said that she did not feel endangered at any time. *Ibid.* Based on her experience as Hughes' roommate, Chadwick stated that Hughes "occasionally has episodes in which she acts inappropriately," but "she is only seeking attention." 2

Per Curiam

Record 108.

Hughes sued Kisela under Rev. Stat. §1979, 42 U. S. C. §1983, alleging that Kisela had used excessive force in violation of the Fourth Amendment. The District Court granted summary judgment to Kisela, but the Court of Appeals for the Ninth Circuit reversed. 862 F. 3d 775 (2016).

The Court of Appeals first held that the record, viewed in the light most favorable to Hughes, was sufficient to demonstrate that Kisela violated the Fourth Amendment. See *id.*, at 782. The court next held that the violation was clearly established because, in its view, the constitutional violation was obvious and because of Circuit precedent that the court perceived to be analogous. *Id.*, at 785. Kisela filed a petition for rehearing en banc. Over the dissent of seven judges, the Court of Appeals denied it. Kisela then filed a petition for certiorari in this Court. That petition is now granted.

In one of the first cases on this general subject, *Tennessee* v. *Garner*, 471 U. S. 1 (1985), the Court addressed the constitutionality of the police using force that can be deadly. There, the Court held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*, at 11.

In *Graham* v. *Connor*, 490 U. S. 386, 396 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Ibid.* And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, at 396–397.

Here, the Court need not, and does not, decide whether Kisela violated the Fourth Amendment when he used deadly force against Hughes. For even assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on these facts Kisela was at least entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White* v. *Pauly*, 580 U. S. ___, ___ (2017) (*per curiam*) (slip op., at 6) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*).

Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U. S., at ___ (slip op., at 6) (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and County of San Francisco* v. *Sheehan*, 575 U. S. ___, ___ (2015) (slip op., at 13) (quoting *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 742 (2011)); see also *Brosseau, supra,* at 198–199.

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix* v. *Luna*, 577 U. S. \_\_\_, \_\_\_ (2015) (*per curiam*) (slip op., at 5) (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id.*, at \_\_\_ (slip op., at 6) (internal quotation marks omitted and emphasis deleted). Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful. *Id.*, at \_\_\_ (slip op., at 12) (internal quotation marks omitted).

"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White*, 580 U. S., at \_\_\_ (slip op., at 7) (internal quotation marks omitted). But the general rules set forth in "*Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Ibid.* Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff* v. *Rickard*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 12). That is a necessary part of the qualified-immunity standard, and it is a part of the standard that the Court of Appeals here failed to imple-

ment in a correct way.

Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick. Kisela had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down Kisela and Garcia. Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them. This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment.

The Court of Appeals made additional errors in concluding that its own precedent clearly established that Kisela used excessive force. To begin with, "even if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here." *Sheehan, supra,* at ___ (slip op., at 13). In fact, the most analogous Circuit precedent favors Kisela. See *Blanford* v. *Sacramento County*, 406 F. 3d 1110 (CA9 2005). In *Blanford*, the police responded to a report that a man was walking through a residential neighborhood carrying a sword and acting in an erratic manner. *Id.*, at 1112. There, as here, the police shot the man after he refused their commands to drop his weapon (there, as here, the man might not have heard the commands). *Id.*, at 1113. There, as here, the police believed (perhaps mistakenly), that the man posed an immediate threat to others. *Ibid.* There, the Court of Appeals determined that the use of deadly force did not violate the Fourth Amendment. *Id.*, at 1119. Based on that decision, a reasonable officer could have

believed the same thing was true in the instant case.

In contrast, not one of the decisions relied on by the Court of Appeals—*Deorle* v. *Rutherford*, 272 F. 3d 1272 (CA9 2001), *Glenn* v. *Washington County*, 673 F. 3d 864 (CA9 2011), and *Harris* v. *Roderick*, 126 F. 3d 1189 (CA9 1997)—supports denying Kisela qualified immunity. As for *Deorle*, this Court has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law. *Sheehan*, 572 U. S., at \_\_\_–\_\_\_ (slip op., at 13–14). *Deorle* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been "physically compliant and generally followed all the officers' instructions"; and he had been under police observation for roughly 40 minutes. 272 F. 3d, at 1276, 1281–1282. In this case, by contrast, Hughes was armed with a large knife; was within striking distance of Chadwick; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute. "Whatever the merits of the decision in *Deorle*, the differences between that case and the case before us leap from the page." *Sheehan*, *supra*, at \_\_\_ (slip op., at 14).

*Glenn*, which the panel described as "[t]he most analogous Ninth Circuit case," 862 F. 3d, at 783, was decided after the shooting at issue here. Thus, *Glenn* "could not have given fair notice to [Kisela]" because a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious. *Brosseau*, 543 U. S., at 200, n. 4. *Glenn* was therefore "of no use in the clearly established inquiry." *Brosseau*, *supra,* at 200, n. 4. Other judges brought this mistaken or misleading citation to the panel's attention while Kisela's petition for rehearing en banc was pending before the Court of Appeals. 862

F.3d*,* at 795, n. 2 (Ikuta, J., dissenting from denial of
rehearing en banc). The panel then amended its opinion,
but nevertheless still attempted to "rely on *Glenn* as illus-
trative, not as indicative of the clearly established law in
2010." *Id.*, at 784, n. 2 (majority opinion). The panel
failed to explain the difference between "illustrative" and
"indicative" precedent, and none is apparent.

The amended opinion also asserted, for the first time
and without explanation, that the Court of Appeals' deci-
sion in *Harris* clearly established that the shooting here
was unconstitutional. *Id.*, at 785. The new mention of
*Harris* replaced a reference in the panel's first opinion to
*Glenn*—the case that postdated the shooting at issue here.
Compare 841 F. 3d 1081, 1090 (CA9 2016) ("As indicated
by *Glenn* and *Deorle*, . . . that right was clearly estab-
lished"), with 862 F. 3d, at 785 ("As indicated by *Deorle*
and *Harris*, . . . that right was clearly established").

The panel's reliance on *Harris* "does not pass the
straight-face test." 862 F. 3d, at 797 (opinion of Ikuta, J.).
In *Harris*, the Court of Appeals determined that an FBI
sniper, who was positioned safely on a hilltop, used exces-
sive force when he shot a man in the back while the man
was retreating to a cabin during what has been referred to
as the Ruby Ridge standoff. 126 F. 3d, at 1202–1203.
Suffice it to say, a reasonable police officer could miss the
connection between the situation confronting the sniper at
Ruby Ridge and the situation confronting Kisela in
Hughes' front yard.

For these reasons, the petition for certiorari is granted;
the judgment of the Court of Appeals is reversed; and the
case is remanded for further proceedings consistent with
this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

## ANDREW KISELA *v.* AMY HUGHES

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17–467.   Decided April 2, 2018

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

Officer Andrew Kisela shot Amy Hughes while she was speaking with her roommate, Sharon Chadwick, outside of their home. The record, properly construed at this stage, shows that at the time of the shooting: Hughes stood stationary about six feet away from Chadwick, appeared "composed and content," Appellant's Excerpts of Record 109 (Record), and held a kitchen knife down at her side with the blade facing away from Chadwick. Hughes was nowhere near the officers, had committed no illegal act, was suspected of no crime, and did not raise the knife in the direction of Chadwick or anyone else. Faced with these facts, the two other responding officers held their fire, and one testified that he "wanted to continue trying verbal command[s] and see if that would work." *Id.,* at 120. But not Kisela. He thought it necessary to use deadly force, and so, without giving a warning that he would open fire, he shot Hughes four times, leaving her seriously injured.

If this account of Kisela's conduct sounds unreasonable, that is because it was. And yet, the Court today insulates that conduct from liability under the doctrine of qualified immunity, holding that Kisela violated no "clearly established" law. See *ante,* at 5–6. I disagree. Viewing the facts in the light most favorable to Hughes, as the Court must at summary judgment, a jury could find that Kisela violated Hughes' clearly established Fourth Amendment rights by needlessly resorting to lethal force. In holding

otherwise, the Court misapprehends the facts and misapplies the law, effectively treating qualified immunity as an absolute shield. I therefore respectfully dissent.

I

This case arrives at our doorstep on summary judgment, so we must "view the evidence . . . in the light most favorable to" Hughes, the nonmovant, "with respect to the central facts of this case." *Tolan* v. *Cotton*, 572 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 8). The majority purports to honor this well-settled principle, but its efforts fall short. Although the majority sets forth most of the relevant events that transpired, it conspicuously omits several critical facts and draws premature inferences that bear on the qualified-immunity inquiry. Those errors are fatal to its analysis, because properly construing all of the facts in the light most favorable to Hughes, and drawing all inferences in her favor, a jury could find that the following events occurred on the day of Hughes' encounter with the Tucson police.

On May 21, 2010, Kisela and Officer-in-Training Alex Garcia received a "'check welfare'" call about a woman chopping away at a tree with a knife. 862 F. 3d 775, 778 (CA9 2016). They responded to the scene, where they were informed by the person who had placed the call (not Chadwick) that the woman with the knife had been acting "erratically." *Ibid.* A third officer, Lindsay Kunz, later joined the scene. The officers observed Hughes, who matched the description given to the officers of the woman alleged to have been cutting the tree, emerge from a house with a kitchen knife in her hand. Hughes exited the front door and approached Chadwick, who was standing outside in the driveway.

Hughes then stopped about six feet from Chadwick, holding the kitchen knife down at her side with the blade pointed away from Chadwick. Hughes and Chadwick

conversed with one another; Hughes appeared "composed and content," Record 109, and did not look angry. See 862 F. 3d, at 778. At no point during this exchange did Hughes raise the kitchen knife or verbally threaten to harm Chadwick or the officers. Chadwick later averred that, during the incident, she was never in fear of Hughes and "was not the least bit threatened by the fact that [Hughes] had a knife in her hand" and that Hughes "never acted in a threatening manner." Record 110–111. The officers did not observe Hughes commit any crime, nor was Hughes suspected of committing one. See 862 F. 3d, at 780.

Nevertheless, the officers hastily drew their guns and ordered Hughes to drop the knife. The officers gave that order twice, but the commands came "in quick succession." *Id.,* at 778. The evidence in the record suggests that Hughes may not have heard or understood the officers' commands and may not have been aware of the officers' presence at all. Record 109–110, 195, 323–324 (Officer Kunz's testimony that "it seemed as though [Hughes] didn't even know we were there," and "[i]t was like she didn't hear us almost"); *id.,* at 304 (Officer Garcia's testimony that Hughes acted "almost as if we weren't there"). Although the officers were in uniform, they never verbally identified themselves as law enforcement officers.

Kisela did not wait for Hughes to register, much less respond to, the officers' rushed commands. Instead, Kisela immediately and unilaterally escalated the situation. Without giving any advance warning that he would shoot, and without attempting less dangerous methods to deescalate the situation, he dropped to the ground and shot four times at Hughes (who was stationary) through a chainlink fence. After being shot, Hughes fell to the ground, screaming and bleeding from her wounds. She looked at the officers and asked, "'Why'd you shoot me?'" *Id.,* at 308. Hughes was immediately transported to the hospital,

where she required treatment for her injuries. Kisela alone resorted to deadly force in this case. Confronted with the same circumstances as Kisela, neither of his fellow officers took that drastic measure.

## II

Police officers are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia* v. *Wesby*, 583 U. S. ___, ___ (2018) (slip op., at 13) (quoting *Reichle* v. *Howards*, 566 U. S. 658, 664 (2012)). Faithfully applying that well-settled standard, the Ninth Circuit held that a jury could find that Kisela violated Hughes' clearly established Fourth Amendment rights. That conclusion was correct.

## A

I begin with the first step of the qualified-immunity inquiry: whether there was a violation of a constitutional right. Hughes alleges that Kisela violated her Fourth Amendment rights by deploying excessive force against her. In assessing such a claim, courts must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham* v. *Connor*, 490 U. S. 386, 397 (1989). That inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.,* at 396; see also *Tennessee* v. *Garner*, 471 U. S. 1, 11 (1985). All of those factors (and others) support the Ninth Circuit's conclusion that a jury could find that Kisela's use of deadly force was objectively unreasonable. 862 F. 3d, at 779–782. Indeed, the panel's resolution of

this question was so convincing that not a single judge on the Ninth Circuit, including the seven who dissented from denial of rehearing en banc, expressly disputed that conclusion. See *id.*, at 791–799 (opinion of Ikuta, J.). Neither does the majority here, which simply assumes without deciding that "a Fourth Amendment violation occurred." *Ante*, at 4.

First, Hughes committed no crime and was not suspected of committing a crime. The officers were responding to a "check welfare" call, which reported no criminal activity, and the officers did not observe any illegal activity while at the scene. The mere fact that Hughes held a kitchen knife down at her side with the blade pointed away from Chadwick hardly elevates the situation to one that justifies deadly force.

Second, a jury could reasonably conclude that Hughes presented no immediate or objective threat to Chadwick or the other officers. It is true that Kisela had received a report that a woman matching Hughes' description had been acting erratically. But the police officers themselves never witnessed any erratic conduct. Instead, when viewed in the light most favorable to Hughes, the record evidence of what the police encountered paints a calmer picture. It shows that Hughes was several feet from Chadwick and even farther from the officers, she never made any aggressive or threatening movements, and she appeared "composed and content" during the brief encounter.

Third, Hughes did not resist or evade arrest. Based on this record, there is significant doubt as to whether she was aware of the officers' presence at all, and evidence suggests that Hughes did not hear the officers' swift commands to drop the knife.

Finally, the record suggests that Kisela could have, but failed to, use less intrusive means before deploying deadly force. 862 F. 3d, at 781. For instance, Hughes submitted

expert testimony concluding that Kisela should have used his Taser and that shooting his gun through the fence was dangerous because a bullet could have fragmented against the fence and hit Chadwick or his fellow officers. *Ibid.*; see also *Bryan* v. *MacPherson*, 630 F. 3d 805, 831 (CA9 2010) (noting that "police are required to consider what other tactics if any were available to effect the arrest" and whether there are "clear, reasonable, and less intrusive alternatives" (internal quotation marks and alteration omitted)). Consistent with that assessment, the other two officers on the scene declined to fire at Hughes, and one of them explained that he was inclined to use "some of the lesser means" than shooting, including verbal commands, because he believed there was time "[t]o try to talk [Hughes] down." Record 120–121. That two officers on the scene, presented with the same circumstances as Kisela, did not use deadly force reveals just how unnecessary and unreasonable it was for Kisela to fire four shots at Hughes. See *Plumhoff* v. *Rickard*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 8) ("We analyze [the objective reasonableness] question from the perspective of a reasonable officer on the scene" (internal quotation marks omitted)).

Taken together, the foregoing facts would permit a jury to conclude that Kisela acted outside the bounds of the Fourth Amendment by shooting Hughes four times.

B

Rather than defend the reasonableness of Kisela's conduct, the majority sidesteps the inquiry altogether and focuses instead on the "clearly established" prong of the qualified-immunity analysis. *Ante*, at 4. To be "'clearly established' . . . [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987). That standard is not nearly as onerous as the majority makes it out to be. As

even the majority must acknowledge, *ante,* at 4, this Court has long rejected the notion that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," *Anderson*, 483 U. S., at 640. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002). At its core, then, the "clearly established" inquiry boils down to whether Kisela had "fair notice" that he acted unconstitutionally. See *ibid.*; *Brosseau* v. *Haugen*, 543 U. S. 194, 198 (2004) (*per curiam*) ("[T]he focus" of qualified immunity "is on whether the officer had fair notice that her conduct was unlawful").

The answer to that question is yes. This Court's precedents make clear that a police officer may only deploy deadly force against an individual if the officer "has probable cause to believe that the [person] poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U. S., at 11; see also *Graham*, 490 U. S., at 397. It is equally well established that any use of lethal force must be justified by some legitimate governmental interest. See *Scott* v. *Harris*, 550 U. S. 372, 383 (2007); *Mullenix* v. *Luna,* 577 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (SOTOMAYOR, J., dissenting) (slip op., at 2–3). Consistent with those clearly established principles, and contrary to the majority's conclusion, Ninth Circuit precedent predating these events further confirms that Kisela's conduct was clearly unreasonable. See *Brosseau*, 543 U. S., at 199 ("[A] body of relevant case law" may "'clearly establish'" the violation of a constitutional right); *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 746 (2011) (KENNEDY, J., concurring) ("[Q]ualified immunity is lost when plaintiffs point either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful'" (quoting

*Wilson* v. *Layne*, 526 U. S. 603, 617 (1999))). Because Kisela plainly lacked any legitimate interest justifying the use of deadly force against a woman who posed no objective threat of harm to officers or others, had committed no crime, and appeared calm and collected during the police encounter, he was not entitled to qualified immunity.

The Ninth Circuit's opinion in *Deorle* v. *Rutherford*, 272 F. 3d 1272 (2001) proves the point. In that case, the police encountered a man who had reportedly been acting "erratically." *Id.,* at 1276. The man was "verbally abusive," shouted "'kill me'" at the officers, screamed that he would "'kick [the] ass'" of one of the officers, and "brandish[ed] a hatchet at a police officer," ultimately throwing it "into a clump of trees when told to put it down." *Id.,* at 1276–1277. The officers also observed the man carrying an unloaded crossbow in one hand and what appeared to be "a can or a bottle of lighter fluid in the other." *Id.,* at 1277. The man discarded the crossbow when instructed to do so by the police and then steadily walked toward one of the officers. *Ibid.* In response, that officer, without giving a warning, shot the man in the face with beanbag rounds. *Id.,* at 1278. The man suffered serious injuries, including multiple fractures to his cranium and the loss of his left eye. *Ibid.*

The Ninth Circuit denied qualified immunity to the officer, concluding that his use of force was objectively unreasonable under clearly established law. *Id.*, at 1285–1286. The court held, "Every police officer should know that it is objectively unreasonable to shoot . . . an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.*, at 1285.

The same holds true here. Like the man in *Deorle*,

Hughes committed no serious crime, had been given no warning of the imminent use of force, posed no risk of flight, and presented no objectively reasonable threat to the safety of officers or others. In fact, Hughes presented even less of a danger than the man in *Deorle*, for, unlike him, she did not threaten to "kick [their] ass," did not appear agitated, and did not raise her kitchen knife or make any aggressive gestures toward the police or Chadwick. If the police officers acted unreasonably in shooting the agitated, screaming man in *Deorle* with beanbag bullets, *a fortiori* Kisela acted unreasonably in shooting the calm-looking, stationary Hughes with real bullets. In my view, *Deorle* and the precedent it cites place the unlawfulness of Kisela's conduct "'beyond debate.'" *Wesby*, 583 U. S., at \_\_\_ (slip op., at 15).

The majority strains mightily to distinguish *Deorle*, to no avail. It asserts, for instance, that, unlike the man in *Deorle*, Hughes was "armed with a large knife." *Ante*, at 7. But that is not a fair characterization of the record, particularly at this procedural juncture. Hughes was not "armed" with a knife. She was holding "a kitchen knife— an everyday household item which can be used as a weapon but ordinarily is a tool for safe, benign purposes"— down at her side with the blade pointed away from Chadwick. 862 F. 3d, at 788 (Berzon, J., concurring in denial of rehearing en banc). Hughes also spoke calmly with Chadwick during the events at issue, did not raise the knife, and made no other aggressive movements, undermining any suggestion that she was a threat to Chadwick or anyone else. Similarly, the majority asserts that Hughes was "within striking distance" of Chadwick, *ante*, at 7, but that stretches the facts and contravenes this Court's repeated admonition that inferences must be drawn in the exact opposite direction, *i.e.,* in favor of Hughes. See *Tolan*, 572 U. S., at \_\_\_ (slip op., at 8). The facts, properly viewed, show that, when she was shot,

Hughes had stopped and stood still about six feet away from Chadwick.  Whether Hughes could "strik[e]" Chadwick from that particular distance, even though the kitchen knife was held down at her side, is an inference that should be drawn by the jury, not this Court.

The majority next posits that Hughes, unlike the man in *Deorle*, "ignored the officers' orders to drop the" kitchen knife.  *Ante*, at 7.  Yet again, the majority here draws inferences in favor of Kisela, instead of Hughes.  The available evidence would allow a reasonable jury to find that Hughes did not hear or register the officers' swift commands and that Kisela, like his fellow officers on the scene, should have realized that as well.  See *supra,* at 3–4.  Accordingly, at least at the summary-judgment stage, the Court is mistaken in distinguishing *Deorle* based on Hughes' ostensible disobedience to the officers' directives.

The majority also implies that *Deorle* is distinguishable because the police in that case observed the man over a 40-minute period, whereas the situation here unfolded in less than a minute.  *Ante*, at 7.  But that fact favors Hughes, not Kisela.  The only reason this case unfolded in such an abrupt timeframe is because Kisela, unlike his fellow officer, showed no interest in trying to talk further to Hughes or use a "lesser means" of force.  See Record 120–121, 304.

Finally, the majority passingly notes that "this Court has already instructed the Court of Appeals not to read [*Deorle*] too broadly."  *Ante,* at 7 (citing *City and County of San Francisco* v. *Sheehan*, 575 U. S. ___, ___–___ (2015) (slip op., at 13–14)).  But the Court in *Sheehan* concluded that *Deorle* was plainly distinguishable because, unlike in *Deorle*, the officers there confronted a woman who "was dangerous, recalcitrant, law-breaking, and out of sight." 575 U. S.*,* at ___ (slip op., at 14).  As explained above, however, Hughes was none of those things: She did not threaten or endanger the officers or Chadwick, she did not

break any laws, and she was visible to the officers on the scene. See *supra,* at 2–4. Thus, there simply is no basis for the Court's assertion that "'the differences between [*Deorle*] and the case before us leap from the page.'" *Ante,* at 7 (quoting *Sheehan*, 575 U. S., at \_\_\_ (slip op., at 14)).

*Deorle*, moreover, is not the only case that provided fair notice to Kisela that shooting Hughes under these circumstances was unreasonable. For instance, the Ninth Circuit has held that the use of deadly force against an individual holding a semiautomatic rifle was unconstitutional where the individual "did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Curnow* v. *Ridgecrest Police*, 952 F. 2d 321, 325 (1991). Similarly, in *Harris* v. *Roderick*, 126 F. 3d 1189 (1997), the Ninth Circuit held that the officer unreasonably used deadly force against a man who, although armed, made "no threatening movement" or "aggressive move of any kind." *Id.,* at 1203.* Both *Curnow* and *Harris* establish that, where, as here, an individual with a weapon poses no objective and immediate threat to officers or third parties, law enforcement cannot resort to excessive force. See *Harris*, 126 F. 3d, at 1201 ("Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officers, or is fleeing and his escape will result in a serious threat of injury to persons").

If all that were not enough, decisions from several other Circuits illustrate that the Fourth Amendment clearly

_____

\*The majority insists that reliance on *Harris* fails the "'straight-face test'" because *Harris* involved an FBI sniper on a hilltop who shot a man while he was retreating to a cabin during a standoff. *Ante*, at 8 (quoting 862 F. 3d, at 797 (opinion of Ikuta, J.)). If anything, though, the context of *Harris* could be viewed as more dangerous than the context here because, unlike Hughes, the suspect in *Harris* had engaged in a firefight with other officers the previous day, during which an officer was shot. See 126 F. 3d, at 1193–1194.

forbids the use of deadly force against a person who is merely holding a knife but not threatening anyone with it. See, *e.g., McKinney* v. *DeKalb County*, 997 F. 2d 1440, 1442 (CA11 1993) (affirming denial of summary judgment based on qualified immunity to officer who shot a person holding a butcher knife in one hand and a foot-long stick in the other, where the person threw the stick and began to rise from his seated position); *Reyes* v. *Bridgwater*, 362 Fed. Appx. 403, 404–405 (CA5 2010) (reversing grant of summary judgment based on qualified immunity to officer who shot a person holding a kitchen knife in his apartment entryway, even though he refused to follow the officer's multiple commands to drop the knife); *Duong* v. *Telford Borough*, 186 Fed. Appx. 214, 215, 217 (CA3 2006) (affirming denial of summary judgment based on qualified immunity to officer who shot a person holding a knife because a reasonable jury could conclude that the plaintiff was sitting down and pointing the knife away from the officer at the time he was shot and had not received any warnings to drop the knife).

Against this wall of case law, the majority points to a single Ninth Circuit decision, *Blanford* v. *Sacramento County*, 406 F. 3d 1110 (2005), as proof that Kisela reasonably could have believed that Hughes posed an immediate danger. But *Blanford* involved far different circumstances. In that case, officers observed a man walking through a neighborhood brandishing a 2½-foot cavalry sword; officers commanded the man to drop the sword, identified themselves as police, and warned "'We'll shoot.'" *Id.,* at 1112–1113. The man responded with "a loud growling or roaring sound," which increased the officers' concern that he posed a risk of harm. *Id.,* at 1113. In an effort to "evade [police] authority," the man, while still wielding the sword, tried to enter a home, thus prompting officers to open fire to protect anyone who might be inside. *Id.,* at 1113, 1118. The Ninth Circuit concluded that use of deadly

force was reasonable in those circumstances. See *id.,* at 1119.

This case differs significantly from *Blanford* in several key respects. Unlike the man in *Blanford*, Hughes held a kitchen knife down by her side, as compared to a 2½-foot sword; she appeared calm and collected, and did not make threatening noises or gestures toward the officers on the scene; she stood still in front of her own home, and was not wandering about the neighborhood, evading law enforcement, or attempting to enter another house. Moreover, unlike the officers in *Blanford*, Kisela never verbally identified himself as an officer and never warned Hughes that he was going to shoot before he did so. Given these significant differences, no reasonable officer would believe that *Blanford* justified Kisela's conduct. The majority's conclusion to the contrary is fanciful.

\*  \*  \*

In sum, precedent existing at the time of the shooting clearly established the unconstitutionality of Kisela's conduct. The majority's decision, no matter how much it says otherwise, ultimately rests on a faulty premise: that those cases are not identical to this one. But that is not the law, for our cases have never required a factually identical case to satisfy the "clearly established" standard. *Hope*, 536 U. S., at 739. It is enough that governing law places "the constitutionality of the officer's conduct beyond debate." *Wesby*, 583 U. S., at \_\_\_ (slip op., at 13) (internal quotation marks omitted). Because, taking the facts in the light most favorable to Hughes, it is "beyond debate" that Kisela's use of deadly force was objectively unreasonable, he was not entitled to summary judgment on the basis of qualified immunity.

## III

For the foregoing reasons, it is clear to me that the

Court of Appeals got it right. But even if that result were not so clear, I cannot agree with the majority's apparent view that the decision below was so manifestly incorrect as to warrant "the extraordinary remedy of a summary reversal." *Major League Baseball Players Assn.* v. *Garvey*, 532 U. S. 504, 512–513 (2001) (Stevens, J., dissenting). "A summary reversal is a rare disposition, usually reserved by this Court for situations in which the law is settled and stable, the facts are not in dispute, and the decision below is clearly in error." *Schweiker* v. *Hansen*, 450 U. S. 785, 791 (1981) (Marshall, J., dissenting); *Office of Personnel Management* v. *Richmond*, 496 U. S. 414, 422 (1990) ("Summary reversals of courts of appeals are unusual under any circumstances"). This is not such a case. The relevant facts are hotly disputed, and the qualified-immunity question here is, at the very best, a close call. Rather than letting this case go to a jury, the Court decides to intervene prematurely, purporting to correct an error that is not at all clear.

This unwarranted summary reversal is symptomatic of "a disturbing trend regarding the use of this Court's resources" in qualified-immunity cases. *Salazar-Limon* v. *Houston*, 581 U. S. ___, ___ (2017) (SOTOMAYOR, J., dissenting from denial of certiorari) (slip op., at 8). As I have previously noted, this Court routinely displays an unflinching willingness "to summarily reverse courts for wrongly denying officers the protection of qualified immunity" but "rarely intervene[s] where courts wrongly afford officers the benefit of qualified immunity in these same cases." *Id.,* at ___–___ (slip op., at 8–9); see also Baude, Is Qualified Immunity Unlawful? 106 Cal. L. Rev. 45, 82 (2018) ("[N]early all of the Supreme Court's qualified immunity cases come out the same way—by finding immunity for the officials"); Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development

and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1244–1250 (2015). Such a one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment.

The majority today exacerbates that troubling asymmetry. Its decision is not just wrong on the law; it also sends an alarming signal to law enforcement officers and the public. It tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished. Because there is nothing right or just under the law about this, I respectfully dissent.