FILED
United States Court of Appeals
Tenth Circuit

May 3, 2021

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

DARLENE ANDRADE; CHRISTINA
CANDELARIA; CYNTHIA RAMONA
CHAVEZ; MONICA RENEE CHAVEZ;
NAOMI GRIEGO; KIMBERLY
SCHREPFER,

      Plaintiffs - Appellants,

v.

BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF BERNALILLO; SERGEANT JASON
ROLSTON, in his individual capacity;
SERGEANT JAMES BRANDON, in his
individual capacity,

      Defendants - Appellees.

No. 20-2120
(D.C. No. 1:19-CV-01144-KWR-SMV)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BALDOCK**, and **KELLY**, Circuit Judges.
_____

At the times relevant to this case, the plaintiffs were pretrial detainees in the

Bernalillo County Metropolitan Detention Center (MDC). They filed this 42 U.S.C.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

§ 1983 excessive-force case, complaining that corrections officers pepper sprayed them when they were assisting a fellow detainee who was having a seizure. The district court entered summary judgment in favor of the defendants, prompting this appeal. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

BACKGROUND[1]

On March 20, 2017, "around 30 to 34" detainees, including the plaintiffs, were together in a "rec yard" as MDC staff searched their cells for lost keys. Aplt. App. at 84, 127. Corrections officers were not present in the yard.

Cynthia Chavez, who was known by other detainees to have a seizure disorder, was standing alone in the yard when she suddenly lowered herself to the floor into a squatting position, placed a towel over her head, and began rocking back and forth. Cynthia's cellmate, Kimberly Schrepfer, recognized those movements as pre-seizure behavior and ran over to her, "crouch[ing] down behind her and tr[ying] to hug her." *Id.* at 81.

"[Cynthia] flew into a seizure and knocked [Schrepfer]" backward. *Id.* As Cynthia violently convulsed, Schrepfer told the other detainees, "Somebody, have them call a code. She's having a seizure." *Id.* Two detainees rushed out the rec yard doors

---

[1] We recount the background facts as indisputably indicated by the silent video footage of the incident and the parties' undisputed deposition testimony. *See Scott v. Harris*, 550 U.S. 372, 379-80 (2007) (holding that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts, and that where a video depicts facts in such a clear manner that "no reasonable jury" could have believed "a different story," then the court must "view[ ] the facts in the light depicted by the videotape").

and into the adjacent cellpod to get help. Other detainees moved toward Schrepfer and Cynthia. Darlene Andrade and Christina Candelaria grabbed Cynthia's legs while Schrepfer held Cynthia's head and neck. Candelaria heard at least one of the detainees who had rushed out to get help, yell "She's having a seizure. She's having a seizure." *Id.* at 127 (internal quotation marks omitted).

Sergeants Jason Rolston and James Brandon were searching a cell when they heard a female voice call out, "fight." *Id.* at 86, 89. They ran into the rec yard with another corrections officer. Sergeant Brandon "saw [Cynthia] sitting down" while "[an]other inmate . . . had her arm around [Cynthia's] head/neck area" and "[a] third inmate was holding her legs down." *Id.* at 86. He saw Cynthia "flailing back and forth like she was punching" as "[s]everal other inmates within the rec yard . . . rush[ed] toward th[e] area." *Id.* Sergeant Rolston thought Cynthia was being "chok[ed] . . . out" by one detainee while another detainee was "holding [Cynthia] down" by her feet and other detainees were "moving towards her . . . to fight also." *Id.* at 88, 89.

According to Schrepfer, the officers yelled, "leave her alone." *Id.* at 81. Before Schrepfer could respond, Sergeants Rolston and Brandon drew their MK-9 foggers and sprayed the group of detainees for two to three seconds, causing all but Schrepfer to retreat from Cynthia.[2] As Sergeant Brandon prepared to discharge his MK-9 again,

---

[2] The plaintiffs testified variously about whether the officers said anything before spraying them. Schrepfer's recollection confirmed the officers' account that they warned the detainees before discharging their MK-9s. Monica Chavez testified the officers said "Get off her" either "while they were spraying or right before they sprayed." Aplt. App. at 142 (internal quotation marks omitted). Candelaria testified she did not recall the officers saying anything beforehand. Andrade testified that

3

warning, "Get off of her, let her go," a detainee spoke up, "we're not fighting, she's having a seizure." *Id.* at 86 (internal quotation marks omitted).

Other officers arrived and "yanked [Schrepfer] up," causing Cynthia's "head [to] hit the concrete." *Id.* at 82. Cynthia "took a big breath" and "went into another seizure." *Id.* Medical personnel responded and rendered aid.

Schrepfer "believe[d] [MDC staff] [had] called a code for [a] fight" because "[t]hey said that we were jumping [Cynthia]." *Id.* Andrade was more specific, testifying that "[corrections officer] Esther called the wrong code saying that we were fighting, so that's when the sergeants came out and fogged us." *Id.* at 116.

MDC subsequently conducted an internal investigation of the incident. In addition to finding that the incident initially appeared to be a fight with Cynthia "in danger of bodily harm," the investigation uncovered that other corrections officers had "heard an inmate yell 'fight' and none of them heard the word seizure until after the [pepper spray] had been deployed." *Id.* at 162. But the investigation also found that Sergeant Rolston told detainee Naomi Griego, "shut the fuck up or I'll mace you too," when she subsequently protested the officers' use of pepper spray. *Id.* at 163 (internal quotation marks omitted).

This lawsuit followed. Cynthia, Schrepfer, Griego, Chavez, Candelaria, and Andrade sued Sergeants Rolston and Brandon and the Board of Bernalillo County

---

"when [the officers] were spraying us, they told us to let go of her. And we said, 'We are not going to let go of her[.]'" *Id.* at 84. These varying accounts reinforce the rapid and chaotic nature of the incident.

4

Commissioners in state court. They pled a Fourteenth Amendment excessive-force claim and multiple claims under New Mexico law. The defendants removed the case to federal district court and sought summary judgment.

The district court granted summary judgment, ruling that Sergeants Rolston and Brandon were entitled to qualified immunity, and that the Board was not liable without an underlying constitutional violation. The district court declined to exercise supplemental jurisdiction over the state law claims and remanded them to state court.

## DISCUSSION
### I. Summary Judgment Standards

We review the district court's grant of summary judgment de novo. *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). "Summary judgment is required when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). Where, as here, the defendants have asserted a qualified-immunity defense, the plaintiffs must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (emphasis and internal quotation marks omitted). "[A]lthough we review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff[s] ha[ve] satisfied [their] heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1212 (10th Cir. 2019) (internal quotation marks omitted).

## II. Excessive Force

### A. Constitutional Violation

The Fourteenth Amendment's Due Process Clause governs a pretrial detainee's excessive-force claim. *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 978 F.3d 1165, 1171 (10th Cir. 2020). "A defendant violates the Fourteenth Amendment by purposely or knowingly using force against a pretrial detainee that is objectively unreasonable." *Id.* (internal quotation marks omitted).

Objective reasonableness is "determin[ed] from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted). This "standard protects an officer who acts in good faith, and who is often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (internal quotation marks omitted).

The following non-exclusive factors serve as guideposts:

> (1) the relationship between the need for the use of force and the amount of force used, (2) the extent of the plaintiff's injury, (3) any effort made by the officer to temper or to limit the amount of force, (4) the severity of the security problem at issue, (5) the threat reasonably perceived by the officer, and (6) whether the plaintiff was actively resisting.

*Id.* at 1171-72 (citations and internal quotation marks omitted).

The plaintiffs focus their attention on the fifth factor, arguing it was unreasonable for Sergeants Rolston and Brandon to believe they were fighting. The plaintiffs cite evidence showing the following facts: the detainees were left unsupervised in the rec yard; one of the detainees who ran for help yelled the word "seizure"; it was not

6

uncommon for MDC detainees to suffer seizures; Cynthia was "convulsing on the ground"; and Sergeant Rolston threatened to "mace" Griego for protesting the officers' use of force.[3]  Aplt. Opening Br. at 11-12.  We are not persuaded.

We begin our analysis of the fifth factor with the strongest evidence in this case, the video, *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (explaining that a qualified immunity determination cannot rest on "visible fiction"), asking whether a reasonable officer could have believed that Cynthia was fighting rather than convulsing.  The video shows that when Sergeants Brandon and Rolston entered the rec yard, Schrepfer and one or two other detainees were restraining Cynthia on the ground in the midst of over a dozen other detainees who were moving closer.  Sergeants Brandon and Rolston discharged their foggers into the group surrounding Cynthia within two or three seconds after arriving.  Although it is difficult to see Cynthia's movements, Schrepfer said that Cynthia was "flopping around like a fish" and preventing her from "get[ting] a good grip."  Aplt. App. at 81.  Candelaria described Cynthia's seizures generally as "pretty violent" and indicated that this seizure was no different.  *Id.* at 126.

Given the rapid and chaotic nature of the scene, and knowing the possibility of inmate-on-inmate violence in a jail setting, a reasonable officer could have perceived the

---

[3] The plaintiffs make several additional factual assertions that lack record support.  For instance, the plaintiffs claim that "the officers dehumanized [them] after the incident, calling them 'zoo animals.'"  Aplt. Opening Br. at 12.  But the plaintiffs' evidence does not attribute that comment to either Sergeant Brandon or Sergeant Rolston.  And supervisory officers like Sergeants Brandon and Rolston "are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights."  *Doe v. Woodard*, 912 F.3d 1278, 1290 (10th Cir. 2019) (internal quotation marks omitted).

scene just as Sergeant Rolston described it. In other words, it appears that one detainee is attempting to choke a fellow detainee from behind with the help of at least one compatriot who is pinning the victim's legs to the ground at the same time other detainees are converging upon the combatants. And although Cynthia's movements are difficult to see in the video, we note that Sergeant Brandon's perception that Cynthia was flailing and punching is consistent with Schrepfer's and Candelaria's testimony.

The plaintiffs' evidence on the fifth factor does not create a genuine dispute as to the reasonableness of the officers' perception. In particular, although Sergeant Rolston approved of the detainees being in the rec yard unsupervised, that fact would at most suggest he did not expect a fight to occur, but it would not change the fact that he and Sergeant Brandon encountered what they reasonably perceived to be a fight. And despite the fact that a detainee exited the rec yard and twice yelled "She's having a seizure," there is no evidence that Sergeant Brandon or Sergeant Rolston heard the word "seizure." It is undisputed that the sergeants heard someone yell "fight," and both Schrepfer and Andrade testified they believed a fight code had been called. Nor is there any evidence that seizures in the MDC population were so common that the sergeants should have presumed a medical emergency was in progress. Finally, Sergeant Rolston's subsequent threat to "mace" Griego for protesting their use of force, while inappropriate, does not create a genuine factual dispute as to whether Sergeants Brandon and Rolston reasonably perceived a fight was in progress when they entered the rec yard.

Next, the plaintiffs briefly mention the first and fourth factors of the excessive-force analysis: the relationship between the need for the use of force and the amount of

8

force used; and the severity of the security problem at issue. They maintain that genuine factual disputes exist as to these factors. We disagree.

In regard to whether Sergeants Brandon and Rolston used an amount of force proportionate to the need to use force, the plaintiffs complain the sergeants "gave [them] no opportunity to respond to their commands or explain what was happening" before "indiscriminately dous[ing] [them] . . . in chemical agent." Aplt. Opening Br. at 13. But as we have already discussed, a reasonable officer could have perceived a fight was in progress, with one detainee being restrained on the ground while multiple other detainees moved to join the fight. These types of circumstances require officers "to make split-second judgments" and cannot be evaluated "with the 20/20 vision of hindsight." *Rowell*, 978 F.3d at 1171 (internal quotation marks omitted). While it is regrettable that pepper spray was deployed against detainees who were actually responding to a medical emergency instead of fighting, the plaintiffs identify no evidence that would allow a reasonable jury to conclude that the sergeants' use of pepper spray was unrelated to the apparent need for such force.

Finally, as to the severity of the security problem, a perceived fight among multiple detainees presents a threat to institutional security. *Cf. Whitley v. Albers*, 475 U.S. 312, 321 (1986) ("When the ever-present potential for violent confrontation and conflagration ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." (emphasis, citations, and internal quotation marks omitted)).

9

Because no reasonable jury could find that Sergeant Brandon and Sergeant Rolston unreasonably used force, the officers were entitled to summary judgment. And in the absence of a Fourteenth Amendment violation by the sergeants, the Board of Bernalillo County Commissioners was likewise entitled to summary judgment. *See Rowell*, 978 F.3d at 1175 ("[A] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." (internal quotation marks omitted)).

**B.    Clearly Established Law**

But even if we assume that Sergeants Brandon and Rolston used constitutionally excessive force, the plaintiffs must still show that clearly-established law proscribed the sergeants' conduct. *See Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019). "A constitutional right is clearly established if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (internal quotation marks omitted). There must be "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff[s] maintain[ ]." *Id.* (internal quotation marks omitted).

The plaintiffs concede they cannot locate a case on point that establishes the unconstitutionality of Sergeants Brandon and Rolston's use of force. But they maintain the sergeants' use of force was so clearly unjustified that it constitutes a violation of clearly established law.

Granted, "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal

10

quotation marks omitted).  But "outside an obvious case" of excessive force, "officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Id.* (internal quotation marks omitted).

The plaintiffs have not shown the obvious illegality of Sergeants Brandon and Rolston's conduct or that existing precedent squarely proscribed their conduct.  *Cf., e.g.,* *Quinn v. Young*, 780 F.3d 998, 1014 (10th Cir. 2015) (finding no "patent and egregious" constitutional violation and "declin[ing] to relieve Plaintiffs of their obligation to identify clearly established law by reference to decisions that at least have a substantial factual correspondence with the instant case").  Instead, the plaintiffs cite two inapposite cases: *Martinez v. New Mexico Department of Public Safety*, 47 F. App'x 513 (10th Cir. 2002), and *DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001).  *Martinez* involved a state trooper's use of mace on a handcuffed arrestee who simply requested the trooper's identification and refused to get into the back of the patrol car.  *Id.* at 515.  *DeSpain* involved a prison guard who indiscriminately discharged pepper spray along a prison tier as a practical joke.  *Id.* at 977.  In contrast, this case involves corrections officers who, under chaotic and rapidly evolving circumstances, mistook a medical emergency for a fight among multiple detainees.

Because the plaintiffs have not shown "that any reasonable official in the [sergeants'] shoes would have understood" they were violating the plaintiffs' Fourteenth Amendment rights, qualified immunity applies.  *See Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).  Thus, even assuming a constitutional violation, Sergeants Brandon and Rolston were entitled to summary judgment.

11

**CONCLUSION**

We affirm the district court's judgment.

Entered for the Court


Bobby R. Baldock
Circuit Judge