# SUPREME COURT OF THE UNITED STATES

## RICARDO SALAZAR-LIMON *v.* CITY OF HOUSTON, TEXAS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 16–515.    Decided April 24, 2017

The petition for a writ of certiorari is denied.

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in the denial of certiorari.

Every year the courts of appeals decide hundreds of cases in which they must determine whether thin evidence provided by a plaintiff is just enough to survive a motion for summary judgment or not quite enough. This is one such case. Officer Thompson stated in a deposition that he shot Salazar-Limon because he saw him turn toward him and reach for his waist in a movement consistent with reaching for a gun. Record, Doc. 39–2, pp. 29–30, 33. Remarkably, Salazar-Limon did not state in his deposition or in an affidavit that he did not reach for his waist, and on that ground the Court of Appeals held that respondents were entitled to summary judgment. 826 F. 3d 272, 278–279 (CA5 2016).

The dissent disagrees with that judgment. The dissent acknowledges that summary judgment would be proper if the record compelled the conclusion that Salazar-Limon reached for his waist, but the dissent believes that, if the case had gone to trial, a jury could have reasonably inferred that Salazar-Limon did not reach for his waist—even if Salazar-Limon never testified to that fact. The dissent's conclusion is surely debatable. But in any event, this Court does not typically grant a petition for a writ of certiorari to review a factual question of this sort, see this Court's Rule 10, and I therefore concur in the denial of

review here.

I write to put our disposition of this petition in perspective. First, whether or not one agrees with the grant of summary judgment in favor of Officer Thompson, it is clear that the lower courts acted responsibly and attempted faithfully to apply the correct legal rule to what is at best a marginal set of facts.

Second, this Court applies uniform standards in determining whether to grant review in cases involving allegations that a law enforcement officer engaged in unconstitutional conduct. We may grant review if the lower court conspicuously failed to apply a governing legal rule. See this Court's Rule 10. The dissent cites five such cases in which we granted relief for law enforcement officers, and in all but one of those cases there was no published dissent. *White* v. *Pauly*, 580 U. S. ___ (2017) (*per curiam*); *Mullenix* v. *Luna*, 577 U. S. ___ (2015) (*per curiam*); *Taylor* v. *Barkes*, 575 U. S. ___ (2015) (*per curiam*); *Carroll* v. *Carman*, 574 U. S. ___ (2014) (*per curiam*); *Stanton* v. *Sims*, 571 U. S. ___ (2013) (*per curiam*). The dissent has not identified a single case in which we failed to grant a similar petition filed by an alleged victim of unconstitutional police conduct.

As noted, regardless of whether the petitioner is an officer or an alleged victim of police misconduct, we rarely grant review where the thrust of the claim is that a lower court simply erred in applying a settled rule of law to the facts of a particular case. See this Court's Rule 10. The case before us falls squarely in that category.

This is undeniably a tragic case, but as the dissent notes, *post*, at 8 (opinion of SOTOMAYOR, J.), we have no way of determining what actually happened in Houston on the night when Salazar-Limon was shot. All that the lower courts and this Court can do is to apply the governing rules in a neutral fashion.

# SUPREME COURT OF THE UNITED STATES

RICARDO SALAZAR-LIMON *v.* CITY OF
HOUSTON, TEXAS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 16–515.   Decided April 24, 2017

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
joins, dissenting from the denial of certiorari.

Just after midnight on October 29, 2010, a Houston
police officer shot petitioner Ricardo Salazar-Limon in the
back.  Salazar-Limon claims the officer shot him as he
tried to walk away from a confrontation with the officer on
an overpass.  The officer, by contrast, claims that Salazar-
Limon turned toward him and reached for his waistband—
as if for a gun—before the officer fired a shot.  The ques-
tion whether the officer used excessive force in shooting
Salazar-Limon thus turns in large part on which man is
telling the truth.  Our legal system entrusts this decision
to a jury sitting as finder of fact, not a judge reviewing a
paper record.

The courts below thought otherwise.  The District Court
credited the officer's version of events and granted sum-
mary judgment to respondents—the officer and the city.
97 F. Supp. 3d 898 (SD Tex. 2015).   The Fifth Circuit
affirmed.  826 F. 3d 272 (2016).  But summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact."  Fed. Rule Civ. Proc. 56(a).  The courts
below failed to heed that mandate.  Three Terms ago, we
summarily reversed the Fifth Circuit in a case "reflect[ing]
a clear misapprehension of summary judgment stand-
ards."  *Tolan* v. *Cotton*, 572 U. S. ___, ___ (2014) (*per
curiam*) (slip op., at 10).  This case reflects the same fun-
damental error.  I respectfully dissent from the Court's
failure to grant certiorari and reverse.

I

The encounter at issue here occurred around midnight on October 29, 2010, on the outskirts of Houston, Texas. Salazar-Limon, who had been drinking, was driving with three other men down Houston's Southwest Freeway. Houston Police Department Officer Chris Thompson was manning a speed gun on the freeway that night and spotted Salazar-Limon's truck weaving between lanes. He turned on his lights and sirens, and Salazar-Limon pulled over and stopped on the shoulder of an overpass. Thompson walked over to the window of Salazar-Limon's truck and asked for his driver's license and proof of insurance, which Salazar-Limon provided. Thompson checked Salazar-Limon's license and found no outstanding warrants.

When Thompson returned to the truck, the incident quickly escalated. Thompson asked Salazar-Limon to step out of the truck—apparently intending to conduct a blood alcohol test—and the two men began to walk together toward Thompson's patrol car. Although the men dispute the details of what happened next, they agree that Thompson tried to put Salazar-Limon in handcuffs; that Salazar-Limon resisted; and that a brief struggle ensued. At the end of the struggle, Salazar-Limon turned away and began to walk back to his truck, his back to Thompson. Thompson drew his firearm and told Salazar-Limon to stop walking.

What matters is what happened next, and here the men tell different stories. According to Salazar-Limon, Thompson shot him "immediately"—at most, within "seconds" of the oral command. Record, Doc. 39–1, p. 8. Salazar-Limon testified that when the bullet hit his back, he began to turn toward Thompson and then fell to the ground. *Ibid.* Thompson's version of the story differs. According to Thompson, when he told Salazar-Limon to stop walking, Salazar-Limon raised his hands toward his waistband—as if for a weapon—and turned toward him. *Id.,* Doc. 39–2,

at 29. Thompson testified that he shot Salazar-Limon only "[o]nce he made the motion towards his waistband." *Ibid.* Salazar-Limon, in other words, claims that Thompson shot him in the back while he was walking away. Thompson claims that Salazar-Limon provoked the shot by turning toward him and reaching for what he thought was a gun.

Salazar-Limon survived the encounter but sustained crippling injuries. In 2011, he sued Thompson, the city of Houston, and various police officials, alleging violations of his constitutional rights. Respondents removed the case to federal court and moved for summary judgment, arguing that Thompson was protected by qualified immunity.[1] Respondents emphasized that, in their view, even viewed in the light most favorable to Salazar-Limon, the facts did not support an excessive-force claim:

> "Thompson was dealing with a suspect who physically resisted arres[t] while the two stood on a dimly lit overpass of a busy expressway; he was alone with Salazar-Limon and [three] other suspects, all of whom he had not searched; Salazar-Limon disobeyed Thompson's orders to stop and proceeded to walk in the direction of his truck[,] which had not been searched either." *Id.*, Doc. 31, at 20.

Respondents did not cite Thompson's allegation that Salazar-Limon had turned and reached for his waistband, at least not in any part of their motion that relied only on undisputed facts; rather, they relied on the facts *preceding* the alleged turn and reach to argue that Thompson acted reasonably under the circumstances. See *id.,* at 13–14

———————
[1] The city also argued that Salazar-Limon had failed to plead a claim for supervisory liability against it under *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658 (1978). The District Court granted summary judgment to the city, and although Salazar-Limon argued on appeal that it erred in doing so, he does not renew that contention here.

(statement of undisputed facts).

The District Court granted summary judgment to re-spondents, but on a different understanding of the alleged facts. In the District Court's view, "Thompson testified that Salazar[-Limon] stopped walking and start[ed] turn-ing back toward Thompson, reaching toward his waist-band," and Salazar-Limon "offered no controverting evi-dence." 97 F. Supp. 3d, at 906. As a result, the District Court found, "uncontroverted record evidence" showed that Salazar-Limon "disregarded repeated orders, walked away, then turned back toward Thom[p]son and reached for his waistband before Thompson fired." *Ibid.*; see also *ibid.* ("The undisputed summary judgment evidence showe[d] that . . . as [Salazar-Limon] walked away from Officer Thompson toward his own truck, he reached to-ward his waistband and began to turn back toward the officer"); *id.,* at 907 ("[T]he record shows that when Thompson saw Salazar[-Limon] turn toward him, he was reaching toward his waistband"); *id.,* at 909 ("Salazar[-Limon] has pointed to no summary judgment evidence contradicting Thompson's testimony that he shot because . . . Salazar[-Limon] reached for his waistband and turned toward him"). On this view of the facts, the District Court held, Thompson was entitled to qualified immunity. *Ibid.*

The Fifth Circuit affirmed. 826 F. 3d 272. It acknowl-edged Salazar-Limon's argument that the District Court erred in relying on disputed facts, including its findings that Salazar-Limon had turned and reached for his waist-band before he was shot. *Id.,* at 278. But it explained that "only one [of these findings] need be addressed—whether Salazar[-Limon] reached for his waistband before being shot." *Ibid.* "[R]ecord evidence," the panel stated, "shows that Officer Thompson testified that . . . he saw Salazar[-Limon] reach for his waistband." *Ibid.* By contrast, it explained, Salazar-Limon "did not deny reaching for his waistband; nor has he submitted any other controverting

evidence in this regard." *Id.,* at 278–279 (footnote omitted). To support its assertion, the panel cited only the District Court's finding that "'uncontroverted record evidence shows that Salazar[-Limon] . . . reached for his waistband before Thompson fired.'" *Id.,* at 278, n. 5 (quoting 97 F. Supp. 3d, at 906). Thus adopting the same view of the facts as the District Court had, the panel held that Thompson was shielded by qualified immunity.

## II

This is not a case that should have been resolved on summary judgment. Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986); see also *First Nat. Bank of Ariz.* v. *Cities Service Co.*, 391 U. S. 253, 289 (1968) (the question at summary judgment is whether a jury should "resolve the parties' differing versions of the truth at trial"). In doing so, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'" *Scott* v. *Harris*, 550 U. S. 372, 378 (2007) (quoting *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962) (*per curiam*)).

Applying that rule to this case is easy work. The question before the lower courts was whether the facts, taken in the light most favorable to Salazar-Limon, entitled Thompson to judgment on Salazar-Limon's excessive-force claim. *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001); *Graham* v. *Connor*, 490 U. S. 386, 394 (1989). Although such cases generally require courts to wade through the "factbound morass of 'reasonableness,'" *Scott*, 550 U. S., at 383, here

the question whether Thompson's use of force was reasonable turns in large part on exactly what Salazar-Limon did in the moments before Thompson shot him. Indeed, the courts below needed to ask only one question: Did Salazar-Limon turn and reach for his waistband, or not? If he did, Thompson's use of force was reasonable. If he did not, a jury could justifiably decide that the use of force was excessive.

Given that this case turns in large part on what Salazar-Limon did just before he was shot, it should be obvious that the parties' competing accounts of the event preclude the entry of summary judgment for Thompson. Thompson attested in a deposition that he fired his gun only *after* he saw Salazar-Limon turn and "ma[k]e [a] motion towards his waistband area." Record, Doc. 39–2, at 29. Salazar-Limon, by contrast, attested that Thompson fired either "immediately" or "seconds" after telling Salazar-Limon to stop—and in any case *before* Salazar-Limon turned toward him. *Id.*, Doc. 39–1, at 7–8. These accounts flatly contradict each other. On the one, Salazar-Limon provoked the use of force by turning and raising his hands toward his waistband. On the other, Thompson shot without being provoked. It is not for a judge to resolve these "differing versions of the truth" on summary judgment, *First Nat. Bank*, 391 U. S., at 289; that question is for a jury to decide at trial.

The courts below reached the opposite conclusion only by disregarding basic principles of summary judgment. The District Court reasoned that Salazar-Limon "offered no controverting evidence" against Thompson's testimony that he turned and reached for his waistband before he was shot, 97 F. Supp. 3d, at 906, and the Fifth Circuit similarly reasoned that Salazar-Limon had not "submitted any other controverting evidence" regarding that fact, 826 F. 3d, at 279. This is plainly wrong. Salazar-Limon's own testimony "controverted" Thompson's claim that Salazar-

Limon had turned and reached for his waistband. The sworn testimony of an eyewitness is competent summary judgment evidence. And Salazar-Limon's testimony "controverted" Thompson's; indeed, the two contradict one another in every material way. Salazar-Limon needed no other evidence to defeat summary judgment.

Respondents defend the judgment below on the ground that Salazar-Limon "had the opportunity to directly contradict Officer Thompson's testimony," but did not do so. Brief in Opposition 16. JUSTICE ALITO advances the same argument. *Ante,* at 1 (concurring opinion). They argue that Salazar-Limon never explicitly stated, "I did not reach for my waistband," and that his failure to do so permitted the courts below to grant summary judgment to Thompson. But this inference is questionable at best: Salazar-Limon had no need to introduce such an explicit statement, given respondents' concession that the events immediately preceding the gunshot (including the alleged waistband reach) were subject to dispute. See Record, Doc. 31, at 13–14. And even if the inference respondents suggest was a reasonable one, it would be improper at the summary judgment stage. At that stage, all "reasonable inferences should be drawn in favor of the nonmoving party"—here, Salazar-Limon. *Tolan*, 572 U. S., at ___ (slip op., at 10). The most natural inference to be drawn from Salazar-Limon's testimony was that he neither turned nor reached for his waistband before he was shot—especially as no gun was ever recovered. See *Cruz* v. *Anaheim*, 765 F. 3d 1076, 1079 (CA9 2014) ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that [the victim] didn't have a gun on him, so why would he have reached for his waistband?").[2] Respondents' argument to the contrary "reflects

_____

[2] Some commentators have observed the increasing frequency of incidents in which unarmed men allegedly reach for empty waistbands

a clear misapprehension of summary judgment stand-ards." *Tolan*, 572 U. S., at ___ (slip op., at 10).

This is not a difficult case. When a police officer claims that the victim of the use of force took some act that would have justified that force, and the victim claims he did not, summary judgment is improper. The Fifth Circuit's deci-sion should be reversed.

\*          \*          \*

Only Thompson and Salazar-Limon know what hap-pened on that overpass on October 29, 2010. It is possible that Salazar-Limon did something that Thompson reason-ably found threatening; it is also possible that Thompson shot an unarmed man in the back without justification. What is clear is that our legal system does not entrust the resolution of this dispute to a judge faced with competing affidavits. The evenhanded administration of justice does not permit such a shortcut.

Our failure to correct the error made by the courts below leaves in place a judgment that accepts the word of one party over the word of another. It also continues a dis-turbing trend regarding the use of this Court's resources. We have not hesitated to summarily reverse courts for wrongly denying officers the protection of qualified im-munity in cases involving the use of force. See, *e.g., White* v. *Pauly*, 580 U. S. ___ (2017) (*per curiam*); *Mullenix* v.

_____

when facing armed officers. See Faturechi, Deputies' Shooting of Unarmed Suspects Rise, L. A. Times, Sept. 23, 2011, pp. A1, AA7 (report-ing that nearly half of the individuals shot by Los Angeles police after allegedly reaching for their waistbands turned out to be unarmed); Balko, When Unarmed Men Reach for Their Waistbands, Washington Post, Aug. 29, 2014, https://www.washingtonpost.com/news/the-watch/wp/2014/08/29/when-unarmed-men-reach-for-their-waistbands/ (as last visited Apr. 11, 2017) (collecting cases). That these cases are increasingly common makes it even more important for lower courts—confronted with such inconsistencies—to let the jury exercise its role as the arbiter of credibility disputes.

*Luna*, 577 U. S. \_\_\_ (2015) (*per curiam*); *Taylor* v. *Barkes*, 575 U. S. \_\_\_ (2015) (*per curiam*); *Carroll* v. *Carman*, 574 U. S. \_\_\_ (2014) (*per curiam*); *Stanton* v. *Sims*, 571 U. S. \_\_\_ (2013) (*per curiam*). But we rarely intervene where courts wrongly afford officers the benefit of qualified immunity in these same cases. The erroneous grant of summary judgment in qualified-immunity cases imposes no less harm on "'society as a whole,'" *City and County of San Francisco* v. *Sheehan*, 575 U. S. \_\_\_, \_\_\_, n. 3 (2015) (slip op., at 10, n. 3) (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 814 (1982)), than does the erroneous denial of summary judgment in such cases. We took one step toward addressing this asymmetry in *Tolan.* 572 U. S., at \_\_\_ (slip op., at 11). We take one step back today.

I respectfully dissent.