**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5553-15T2

BRYHEIM JAMAR BASKIN,

    Plaintiff-Appellant,

v.

RAFAEL MARTINEZ, CITY OF
CAMDEN, and SCOTT THOMPSON,

    Defendants-Respondents.

_____

        Argued November 27, 2017 – Decided  September 14, 2018

        Before Judges Accurso, O'Connor and Vernoia
        (Judge Accurso dissenting).

        On appeal from Superior Court of New Jersey, Law
        Division, Camden County, Docket No. L-0901-14.

        Paul R. Melletz argued the cause for appellant
        (Gerstein, Grayson, Cohen & Melletz, LLP, attorneys;
        Paul R. Melletz, on the brief).

        Timothy J. Galanaugh, Assistant City Attorney,
        argued the cause for respondents (Marc A. Riondino,
        City Attorney, attorney; Timothy J. Galanaugh, on the
        brief).

PER CURIAM

In this action, plaintiff Bryheim Jamar Baskin alleges defendant Rafael Martinez, a police officer of defendant City of Camden (Camden), violated his federal constitutional rights under 42 U.S.C. § 1983. Specifically, plaintiff claims Martinez used excessive force when he shot and wounded plaintiff in the abdomen. Plaintiff also alleges Camden and defendant Scott Thompson, the chief of police of the Camden Police Department at the time of the shooting[1], are liable for tolerating the use of excessive force within the Department. In addition, plaintiff asserts state-law claims against all defendants for assault and battery and negligence.

Following discovery, Martinez filed a motion for summary judgment claiming the doctrine of qualified immunity protected him from plaintiff's allegations he employed excessive use of force. On July 22, 2016, the Law Division entered an order granting him summary judgment. In its oral opinion, the court determined Martinez was entitled to summary judgment on the ground qualified immunity protected him from liability for his actions. Plaintiff appeals from this order.

---

[1] The Camden Police Department disbanded in 2013. The Camden County Police Department has been providing police services to Camden since.

2

Having reviewed the record, the arguments presented, and the prevailing legal standards, we reverse and remand for further proceedings.

I

For the balance of the opinion, the term "defendant" shall refer to Martinez only. We start by recounting plaintiff's version of what transpired. Although we must view the facts in the light most favorable to plaintiff to determine whether the grant of summary judgment to defendant, the moving party, was appropriate, see Rule 4:46-2(c), because it bears upon our disposition, we provide defendant's version as well.

With some exceptions specifically identified below, we glean plaintiff's account from his deposition testimony. Plaintiff testified that in the early afternoon of September 11, 2012, he was exiting a parking lot in Camden when an unmarked police car drove in front of him and tried to cut him off. Instead of stopping, plaintiff put his car in reverse, backed up, and collided into an unmarked police car that was behind him.

Plaintiff asserted he did not know the two unmarked cars were in fact police cars or that the cars were occupied by police officers. He also claimed he did not know why the occupants in either car wanted to stop him, explaining:

3

All I know is that when I – that first car came and cut me off . . . I turned and . . . looked in my rearview, which is when I saw another car. That's when I know somebody want me. I didn't know if it's somebody shooting is the police; I don't know. I just know somebody want me . . . . That area is shootings. It is – it a lot of shootings and drug activity . . . . [P]eople get killed and shot for unmistaken car.

Plaintiff admitted he had a loaded, semiautomatic handgun in his possession and that drugs were located in his car.

Approximately two months before his deposition, plaintiff pled guilty to various offenses arising out of his encounter with the police. Those offenses were second-degree eluding, second-degree unlawful possession of a weapon, third-degree resisting arrest, and possession with intent to distribute less than a half-an-ounce of cocaine.[2]

During the plea colloquy, plaintiff admitted the police attempted to stop him. Even though he was aware the police wanted to stop and take him into custody, he resisted their efforts by "speeding off" at a high rate of speed and colliding into one of the police cars. He acknowledged that by doing so he put the officers and the community at large at risk of harm. Elsewhere in the colloquy he equivocated and indicated he did not collide into the police car but, rather, he and the driver of the police vehicle "hit each other."

---

[2] The specific statutory citations to these offenses and the degree of the drug offense were not included in the record.

4

Returning to his deposition testimony, plaintiff testified that after the collision with the police vehicle, he fled from the accident scene on foot. The police chased him, also on foot. Plaintiff's gun was in his right front pocket, although in his responding statement of material facts to defendant's summary judgment motion, see Rule 4:46-2(b), he stated the gun was actually tucked in his waistband.

At one point plaintiff dropped his gun, but he stopped to retrieve it and resumed running. He eventually ran into and became cornered in the yard of a residence. Aware he was being pursued by the police, he threw the gun away from himself. He admitted the police were not present when he discarded the gun and, thus, were unaware he had disarmed himself.

Plaintiff then put his hands, which were empty, up in the air to signal he was surrendering. However, a police officer then entered the yard and shot him in the abdomen. Plaintiff did not say anything to the officer before the officer shot him, believing that raising his hands in the air was sufficient to show he was capitulating.

It is not clear from his testimony how high in the air his hands were, but plaintiff testified they were "probably" higher than his ears. Plaintiff mentioned he had two cell phones in his possession when he was shot, but

5

claimed the cell phones were in his pocket and not in his hands when he was shot.

Not surprisingly, defendant's account is different. In his deposition testimony, defendant noted that an unmarked police car attempted to pull plaintiff over after plaintiff exited a parking lot without signaling. At the time, defendant was in another police car but, to provide assistance to the other officers, approached the area where the police were endeavoring to pull plaintiff over. Plaintiff's car then backed up at a "fast pace" and struck the car defendant was occupying. Defendant noted his car was also an unmarked car, and acknowledged plaintiff likely would not have known his car was a police vehicle. Plaintiff then fled from his car on foot. Defendant followed plaintiff on foot while another officer followed by car.

While chasing plaintiff, defendant identified himself as a police officer and shouted "numerous verbal warnings" to stop, but to no avail. Defendant heard an officer yell that plaintiff had a gun, and defendant also observed plaintiff drop and pick up a black handgun during the course of the chase. Plaintiff then ran into the rear of a residence with the gun in his hand, at which point defendant unholstered his own gun and slowly moved around the house to the rear yard.

6

A-5553-15T2

As defendant approached the rear corner of the house, he began to "slice the pie."  Defendant explained "slicing the pie" is a tactic he learned at the police academy, and

> is basically used when you know there is a threat
> around the corner and you have to pursue but you
> want to safely do it, you want to do it as safely as
> possible.  Instead of me running straight behind him, I
> – I get up there, and I start to slowly look a little,
> piece by piece, go over until – and I said slowly just to
> make sure there is no gun popping or I'm getting shot
> at immediately.  If there is a threat and I need to
> disappear behind the house, I can go back . . . .
>
> I just gradually took it step by step as I got a little
> more view of the backyard, until I could see the entire
> back of the residence.

When defendant finally gained full view of the back yard, plaintiff had his back to defendant, but plaintiff immediately started to turn around "medium to fast," and plaintiff's hands were pointing straight out in front of him.  When plaintiff was half-way through his turn, defendant saw a black object in plaintiff's right hand.  Having seen plaintiff with a gun moments before, defendant assumed the object was a gun and, "in fear of my life," fired one shot into plaintiff's abdomen.    Disabled from the shot, plaintiff fell over and was subsequently transported to the hospital for treatment. Defendant admits he did not say anything to plaintiff before he shot him.  Defendant did not check to see what had been in plaintiff's hand just before he fired.

7

A resident on the street (eyewitness) saw the shooting. During her deposition, the eyewitness testified she saw plaintiff run into the backyard of a residence across the street from where she was standing at the time. She stated the officer was "right behind" plaintiff when plaintiff ran into the yard; there was no gap in time between the moment plaintiff and the officer arrived in the back yard.

According to the eyewitness, after they both arrived in the yard, plaintiff put his hands up, turned around, and was shot by the officer. At first she stated plaintiff was completely turned around, but then indicated she was not sure if plaintiff was still turning around toward the officer when shot. However, she noted, "I know his hands were in the air, and you could see him turning around." She further testified she did not see anything in plaintiff's hands when he had his hands up and turned around. She also did not see any objects in plaintiff's hands when he ran into, or observe him toss a gun after, he arrived in the back yard.

At the conclusion of discovery, defendant filed a motion for and was granted summary judgment. The court determined defendant was protected by qualified immunity. The court's findings were as follows.

> [W]hat I have is the plaintiff involved in a high speed
> chase, crashed his car into the officers, fleeing on foot,
> known to have a weapon. The only information

8

Martinez has is that [plaintiff] still has the weapon because Martinez is not privy to the information, and there's no dispute as to this, Martinez is not privy to the information that the plaintiff dropped his gun. [Martinez] chases him into an alleyway, and in Martinez' perception, which is not refuted by any of the other witnesses, he turns toward him and Martinez fires. Even if I take out Martinez' belief that he had a black object in his left hand, the fact that this person, when confronted in that alley by the officer, turned towards the officer, I find that gives the officer qualified immunity for his actions in using his weapon.

I'm not requiring this officer to make a distinction as to whether [plaintiff] had something in his hands or he didn't at this point in time. [Martinez] knows [plaintiff is] armed. I'm not giving the officer the obligation to have to determine whether it's a cell phone or a weapon in the hand. I don't even have to go there.

Once this Mr. Baskin brings this officer on a chase that leads him into this alley and Baskin turns towards the officer, at that point the officer has qualified immunity based on the actions he took to protect himself against someone who was known to be armed in his estimation based on the facts that he had in his knowledge. What Baskin didn't do was get on the ground, be passive, or anything of that nature.

The court discounted the eyewitness' account, stating, "she really doesn't say his hands were empty. She says she didn't see anything. She doesn't even say she was able to see his hands and that his hands were empty."

## II

On appeal, plaintiff primarily contends there were material facts in dispute that precluded the entry of summary judgment, see Rule 4:46-2(c).

In considering plaintiff's appeal, we must adhere to well-settled principles applicable to summary judgment motions. A court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). If there are materially disputed facts, the motion for summary judgment should be denied. See Parks v. Rogers, 176 N.J. 491, 502-03 (2003); Brill, 142 N.J. at 540.

"The doctrine of qualified immunity operates to shield 'government officials performing discretionary functions generally . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Morillo v. Torres, 222 N.J. 104, 116 (2013) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense; thus, the burden of proving its applicability rests with the defendant. See Beers-Capitol v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

To determine if qualified immunity applies to a government official, the court must examine whether: (1) "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and (2) "the right was clearly established" at the time of the objectionable conduct.[3]  Saucier v. Katz, 533 U.S. 194, 201 (2001).  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Here, the specific constitutional right at issue is the Fourth Amendment right to be free from excessive force.[4]  Under this Amendment, a person is protected from unreasonable seizures, see Graham v. Connor, 490 U.S. 386, 394 (1989), and the use of excessive force violates a suspect's Fourth

---

[3]  Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis is to be addressed first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

[4]  Although in his complaint plaintiff asserts defendant violated the Fifth, Eighth, and Fourteenth Amendments, it is the Fourth Amendment that governs the disposition of claims of excessive force of use.  See Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999).

11

Amendment rights, ibid.  The Fourth Amendment permits a police officer to exercise only an "objectively reasonable" degree of force in effectuating an arrest or other seizure.  Kopec v. Tate, 361 F.3d 772, 776-78 (3d Cir. 2004). "[T]here is no doubt that Graham . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  Saucier, 533 U.S. at 201-202.

To determine whether an officer's conduct was objectively reasonable in an excessive use of force case, a court looks to the "totality of the circumstances."  See Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).  Factors that must be considered when evaluating reasonableness include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Ibid. However, deadly force will only be considered reasonable if "necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  Garner, 471 U.S. at 3 (emphasis supplied).  In addition:

> The "reasonableness" of a particular use of force must
> be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of

12

hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

[Ibid. (citations omitted).]

As our Supreme Court recently noted, "[o]rdinarily, application of the defense of qualified immunity is a legal question for the court rather than the jury . . . ." Brown v. State, 230 N.J. 84, 98-99 (2017). However, "[a]n exception to that rule arises when the case involves disputed issues of fact. In such a circumstance, the case may be submitted to the jury to determine 'the who-what-when-where-why type of historical fact issues,' after which the trial judge may incorporate those findings in determining whether qualified immunity applies." Id. at 99 (citing Schneider v. Simonini, 163 N.J. 336, 359 (2000)). Therefore, although a court is to determine if qualified immunity applies in a matter and such question is to be evaluated in the light most favorable to the party asserting the alleged injury, before undertaking such evaluation, the jury must resolve any disputed issues of fact.

Here, plaintiff and defendant's versions of what occurred in the moments just before plaintiff was shot differ in material respects. Plaintiff concedes defendant did not know he was no longer armed, but asserts his hands were up

13

and empty when defendant entered the yard and shot him, a claim corroborated by the eyewitness.

Defendant claims when he arrived at the rear corner of the house, plaintiff turned toward him with his hands stretched out in front of him -- not up -- with a black object in his right hand. Defendant stated it was when he saw the black object that he fired, suggesting that, if plaintiff's hands were empty, he would not have shot plaintiff. Accordingly, whether plaintiff held an object in his hand when defendant entered the rear yard and saw plaintiff is pivotal. This disputed issue of material fact alone should have precluded the entry of summary judgment.

When the trial court evaluated the facts, it did consider whether defendant was entitled to qualified immunity if plaintiff had not been holding a black object in his hand when defendant shot him; however, the court still found defendant entitled to immunity even if such fact were true. The difficulty with that determination is defendant is asserting he was induced to and justified in shooting plaintiff because he was holding a black object in his hand. If plaintiff were not holding an object in his hand then, according to defendant -- at least implicitly -- there would not have been a reason to shoot him. The court assumed defendant's reaction would have been the same and would have been reasonable even if plaintiff had not been holding an object in

14

his hand; however, the evidence provided does not support that conclusion. Clearly, whether plaintiff was holding a black object in his hand is significantly material.

It is also not known if the court assumed other facts as asserted by plaintiff were true when it made its decision. It is unclear whether the court determined plaintiff had his hands up or out in front of him, as well as other contentions about the moments leading up to the shooting. The court also improperly weighed the eyewitness' observations.

For example, the court was dismissive of the eyewitness' account because, for example, she testified she did not see anything in plaintiff's hands when he was shot, rather than state plaintiff's hands were empty. However, the court was required to credit the evidence and all inferences in the light most favorable to plaintiff. See R. 4:46-2(c). Further, it was not for the court to assume or interpret what the eyewitness intended or meant by her testimony. See Conrad v. Michelle & John, Inc., 394 N.J. Super. 1, 13 (App. Div. 2007) (stating, in the context of a summary judgment motion, a judge "does not weigh the evidence, or resolve credibility disputes," as such functions are "uniquely and exclusively performed by a jury").

We also note the eyewitness' testimony challenged defendant's claim he "sliced the pie" before entering the back yard. Defendant's testimony

15

suggested he was not impulsive but carefully assessed the situation before acting. According to the eyewitness, defendant ran into the back yard right behind plaintiff and immediately shot him. That testimony potentially affects defendant's credibility. Of course, the weight to be accorded such testimony and its impact upon a party's credibility is for the jury to decide. Ibid.

Accordingly, we reverse the July 22, 2016 order and remand so that the question of what exactly occurred before the shooting can be assessed and resolved by a jury. There exist disputed facts that must be resolved before the court can determine whether defendant's actions were objectively reasonable and if he is entitled to qualified immunity. We do not mean to suggest the question whether plaintiff was holding an object in his hand when shot is the only material fact in dispute. Any "who-what-when-where-why type of historical fact issues," Brown, 230 N.J. at 99, shall be decided by the jury.

Finally, in his brief, defendant contends plaintiff's convictions preclude him from obtaining damages in an action asserted under 42 U.S.C. § 1983. Defendant cites Heck v. Humphrey, 512 U.S. 477 (1994), in support of his argument. Defendant raised this issue before the trial court but it did not rule on it.

We also decline to address this issue because, first, defendant did not file a notice of cross-appeal and, second, the trial court did not decide this issue;

16

thus, we decline to do so in the first instance. Duddy v. Gov't Emps. Ins. Co., 421 N.J. Super. 214, 221 (App. Div. 2011).

We also conclude that, on remand, this matter should be heard by a judge different from the one who presided over defendant's summary judgment motion. See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617 (1986) (Court ordered the case assigned to a different judge because the trial court "may have a commitment to its findings"). Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

_____

**ACCURSO, J.A.D., dissenting.**

As our Supreme Court has recently reiterated, "a reasonable mistake of fact on the part of a police officer will not render a search or arrest predicated on that mistake unconstitutional." State v. Sutherland, 231 N.J. 429, 431 (2018). That principle applies to qualified immunity as well. An officer does not lose the protection of qualified immunity because he made a reasonable mistake of fact in a split second encounter with a fleeing felon armed with a gun.

The majority reverses summary judgment to Detective Martinez because it finds the Law Division judge erred by resolving disputed issues of material fact in defendants' favor. But whether facts are material is a question of the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Brill, 142 N.J. at 529-30. Because I believe defendants can concede Detective Martinez was mistaken in believing Bryheim Baskin had a gun in his hand at the moment the detective shot him and still be entitled to qualified immunity, I respectfully dissent.

Although the majority focuses on the factual disputes in this record, the principals' accounts of what occurred that September afternoon are remarkably

congruent.  They agree Baskin fled from police trying to effect a car stop.[1]

They agree in the course of doing so, Baskin rammed his car into the

---

[1]  The majority sees a more disputed record, for example noting Baskin's deposition testimony that he was unaware it was the police who tried to pull him over and then chased him when he fled.  Ante at 4.  Baskin, however, pled guilty to, among other things, eluding, resisting arrest and unlawful possession of a firearm.  He acknowledged on the record at his plea hearing that he knew it was the police who were attempting to stop him and he instead sped off "at a high rate of speed" and collided with a police car.  A defendant cannot enter a plea of guilty in this state while maintaining his innocence.  State v. Taccetta, 200 N.J. 183, 195-96 (2009).  Both Baskin's plea, see N.J.R.E. 803(c)(22); N.J. Mfrs. Ins. Co. v. Brower, 161 N.J. Super. 293, 297-98 (App. Div. 1978), and the statements he made on the record when he entered his plea, see N.J.R.E. 803(b)(1); Kohrherr v. Ferreira, 215 N.J. Super. 123, 130-31 (App. Div. 1987), are admissions, fully admissible in this civil action.  See also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 803(b), cmt. on N.J.R.E. 803(c)(22) (2018).

Here are the facts plaintiff admitted on the motion:

1. Detective Ralph Martinez, along with other police officers, was on patrol in the area of 32nd Street and Westfield Avenue in Camden.

2. The area around 32nd and Westfield is an area with significant drug activity.

3. All of the officers involved in this matter were dressed in Class "A" Uniforms, which clearly identified them as police.

4. Detectives attempted to stop Bryheim Baskin, who was driving a red Toyota Camry.

5. Mr. Baskin initially stopped and then backed his car up and collided with a police vehicle.

6. The police vehicle was occupied by Detective Ralph Martinez and Detective Argenis Bernard.

2

7.      After colliding with the police vehicle, Mr. Baskin fled from the scene on foot.

8.      Detective Martinez immediately pursued Mr. Baskin.

9.      Mr. Baskin was carrying a gun he had . . . tucked in his waistband.

10.     Detectives Saladin Webb and Michael Perez joined in the foot pursuit.

11.     Baskin ran from the rear yards of North 32nd Street to the [] Block of Beideman Avenue.

12.     Detective Martinez saw the gun in Mr. Baskin's waistband during the chase.

13.     An independent witness, . . . , confirms Mr. Baskin had a gun when he initially fled the accident scene.

14.     Mr. Baskin eventually ran to the rear yard of [a house on] Beideman Avenue.

15.     Detective Martinez observed Mr. Baskin drop the gun and then reach down to retrieve it.

16.     Mr. Baskin ran behind the house out of Martinez's sight.  Martinez drew his weapon.

17.     Detective Martinez turned the corner and saw Mr. Baskin on the patio attached to the rear of the house.

. . . .

19.     Detective Martinez fired one shot hitting Mr. Baskin in the torso.

. . . .

21.     Mr. Baskin had thrown his gun toward the rear fence of the yard once he had gotten behind the house.

22.     Detective Martinez did not see Mr. Baskin throw the gun.

23.     Mr. Baskin was removed to Cooper Medical Center and treated for a gunshot wound.

24.     The Camden County Prosecutor's Office conducted an investigation into the non-fatal shooting of Bryheim Baskin . . . .

25.     The Camden County Prosecutor's Office concluded Detective Martinez "reasonably believed Bryheim Baskin's actions placed him in imminent danger of death or bodily injury."

26.     The Prosecutor's investigation led to the conclusion that Detective Martinez's actions were justified.

27.     The report outlining the Camden County Prosecutor's investigation and conclusions was reviewed by the New Jersey Attorney General's Division of Criminal Justice.

28.     The Director of the Division of Criminal Justice agreed with the determination of the County Prosecutor's Office.

. . . .

30.     Plaintiff was charged with various crimes arising from this incident.

31.     Plaintiff has pleaded guilty to numerous crimes which he committed on the day this cause of action arose.

32.     Plaintiff pleaded guilty to possession of cocaine with intent to deliver, eluding to avoid arrest and possession of a firearm, a handgun . . . .

33.     Plaintiff has been sentenced in these guilty pleas.

34.     Plaintiff is currently serving his prison sentence.

4

unmarked car Detective Martinez was driving. They agree Baskin fled on foot. They agree Detective Martinez ran after him. They agree the detective was in uniform and that Baskin knew he was being chased by police. They agree Baskin was armed with a gun, and that the detective saw it in Baskin's waistband.

Baskin and the detective agree Baskin ran through a residential neighborhood in Camden, leading the detective through yards and over two fences in an effort to escape. They agree the detective saw Baskin drop his gun in the side yard of a house on Beideman Avenue, stop, pick it up and run around the back of the house out of sight. They agree the detective only unholstered his own weapon when he saw Baskin pick up the gun from the

35. Plaintiff has not challenged or in any way appealed his conviction and sentence.

Here are the facts plaintiff denied:

18. Mr. Baskin turned toward Detective Martinez with a black object in his hand.

. . . .

20. The black object Mr. Baskin had in his hand was a cell phone.

. . . .

29. The Detective when acting reasonably is immune from the claims asserted by Mr. Baskin.

5

ground. They agree that when Baskin ran into the backyard, he found his path blocked by a brick wall and tossed the gun away. They agree the detective had not yet come around the corner of the house to see Baskin toss away the gun.

The two men agree that when Detective Martinez came around the corner of the house seconds later, Baskin was standing on the patio close to the house with his back to the detective. They agree as Baskin swung around to face Detective Martinez that Martinez immediately fired one round from his semi-automatic duty weapon hitting Baskin in the right abdomen.

What the two disagree on is where Baskin's hands were and what, if anything, he was holding. Detective Martinez testified at deposition that "[a]s [he] hit that corner," he saw Baskin's back but not his hands because they were "inside . . . at a 90-degree angle." According to the detective, Baskin "immediately turned towards [him]" with his hands at the same 90-degree angle "pointing straight in front of him." The detective explained that Baskin's "hand never pointed all the way to [the detective's] direction," because as Baskin got "a little bit more than . . . half" way around, the detective saw "the black object" in Baskin's right hand and "fear[ing] for his life . . . pulled the trigger and . . . hit him in the abdomen area."

Baskin testified he knew the officer chasing him saw him stop to pick up the gun after he dropped it and "probably just [saw him] like, going behind the

6

house" where Baskin discovered "the brick wall." Not "want[ing] to get caught with a gun on [him]," Baskin claimed he "tried to throw the gun on the roof, but the gun came back down." He then "threw it . . . far over the — over the brick, so it landed on the —" and "[o]pen[ed] [his] hands up." Baskin testified Detective Martinez was not yet in the back yard when Baskin threw the gun away, explaining "[h]e was coming, but he wasn't there." Baskin claimed he had two phones "[i]n [his] pocket" at the time he was shot, but his hands were empty and open and up around his ears, "[p]robably higher." Police found Baskin's gun in the grass near the brick wall and two cell phones, one in the grass just off the edge of the patio and the other on the patio close to where Baskin was standing when he was shot.

The only witness to apparently see both Baskin and Martinez run down the side yard, around the house, and the shooting, testified Baskin

> went between the houses. And once he got to the
> backyard, it's like — I don't know if it's a pool or
> some kind of wall or barricade. Like, he couldn't go
> any further. And, like, officer's right behind him.
> And he — he, like, put his hands up and he turned
> around. And when he turned around, it was just, like,
> he just got shot that fast.

Although the witness claimed she never "los[t] sight" of Baskin, she did not see him stop to pick up the gun he dropped in the side yard and did not see him toss the gun away before he was shot. The witness claimed Baskin never

7

had anything in his hands. Another witness saw Martinez shoot Baskin but could not see Baskin until he was lying on the ground. The homeowner heard the commotion and the gunshot but did not witness the shooting on her patio.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow, 457 U.S. at 818). The Supreme Court has made clear a court is free "to decide which of the two prongs of qualified-immunity analysis to tackle first." Ibid. Because I think the constitutional claim here a straightforward one, I start there.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard,"[2] Plumhoff v. Rickard, 572 U.S. __, 134 S. Ct. 2012, 2020 (2014), a test admittedly "not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). Accordingly, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

[2] Although Baskin's complaint might be read to assert state law claims, he has pursued only a Fourth Amendment excessive force claim under 42 U.S.C. § 1983.

8

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The Court has explained it chose "a test that cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene" "[b]ecause 'police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.'" Saucier, 533 U.S. at 205 (quoting Graham, 490 U.S. at 396-97).

"The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" County of Los Angeles v. Mendez, 581 U.S. __, 137 S. Ct. 1539, 1546 (2017) (quoting Garner, 471 U.S. at 8-9). It is an "objective" inquiry "judged from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396. "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." Mendez, 137 S. Ct. at 1546.

Applying those standards to the facts considered in the light most favorable to Baskin, I cannot conclude Detective Martinez violated Baskin's Fourth Amendment rights. While there is no question but that "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by

9

shooting him dead,'" Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (quoting Garner, 471 U.S. at 11), the calculus is vastly different "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. at 197-98. In that case, "it is not constitutionally unreasonable" for an officer "to prevent escape," or save himself, "by using deadly force." Id. at 198.

Judging by what Detective Martinez knew when he entered the backyard, Baskin was not "an unarmed, nondangerous suspect." Id. at 197. To the contrary, Baskin had already threatened the lives of the officers and others when he sped away from one police car and crashed into another. He then fled on foot through a residential neighborhood in the middle of the afternoon armed with a gun. Although aware Baskin was armed, the detective never drew his own weapon until he saw the gun in Baskin's hand just before he ran around the back of the house.

When the detective entered the backyard seconds later, he had no way to know Baskin was no longer holding the gun. There is no dispute the detective did not see Baskin throw it towards the wall that blocked his escape, even though he was only seconds behind him. As Martinez entered the backyard and Baskin swung around, as he claimed with his hands empty and open and up around his ears, "[p]robably higher," the detective thought he saw the gun

10

in Baskin's hand and shot him.  The witness claimed "when [Baskin] turned around, it was just, like, he just got shot that fast."  Both Baskin and Martinez agree Martinez shot Baskin as he turned to face Martinez immediately upon Martinez entering the backyard.  There is no dispute that in that split second, Martinez erred, Baskin was not holding a gun.  Indeed, his hands, for purposes of the motion, were empty.

Based on the totality of the circumstances, I cannot find the detective's mistake an unreasonable one.  Baskin was actively resisting arrest and had already threatened the lives of the officers; he posed a dangerous threat to Detective Martinez, the other officers and the women close enough to have witnessed the confrontation.  See Graham, 490 U.S. at 396.  Accepting that Baskin's hands were empty and open as he turned toward Martinez, declaring the detective's decision to fire on Baskin unreasonable would accord only "little more than lip service" to "the great pressure and intensity inherent in a police officer's hot pursuit of a suspect known to be armed and highly dangerous."  Curley v. Klem, 499 F.3d 199, 216 (3d Cir. 2007) (quotation omitted).  In my view, the Fourth Amendment did not require Martinez to wait for a suspect he knew to be armed and extremely dangerous to swing all the way around and face him so the detective could get a better look at the suspect's hands in the split second before he fired.

11

The majority contends the detective's claim he shot Baskin because he saw a black object in his hand, "suggest[s] that, if plaintiff's hands were empty, [the detective] would not have shot" him.  Ante at 14.  It thus concludes "whether plaintiff held an object in his hand when defendant entered the rear yard and saw plaintiff is pivotal."  Id. at 14-15.  I disagree for two related reasons.  First, viewing as "pivotal" whether Baskin was holding an object in his hand when Martinez entered the backyard, impermissibly isolates that fact instead of considering it "as a factor in the totality of the circumstances." District of Columbia v. Wesby, 583 U.S. __ (2018) (slip op. at 11) (quoting Maryland v. Pringle, 540 U.S. 366, 372 n.2 (2003)) (acknowledging the Court's "precedents recognize that the whole is often greater than the sum of its parts — especially when the parts are viewed in isolation").

Second, and more important, the Fourth Amendment does not require that the detective be right, it only requires that he be reasonable.  See Heien v. North Carolina, 547 U.S. __, 135 S. Ct. 530, 536 (2014) (noting "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials").  The question thus is not whether Martinez was right about seeing a black object in Baskin's hand, but assuming he was wrong and Baskin's hand was empty, whether the mistake was an objectively reasonable one under the circumstances.

12

A-5553-15T2

Because I find Detective Martinez's mistake an objectively reasonable one under the "tense, uncertain, and rapidly evolving" circumstances he faced for the reasons I have set out, I find no Fourth Amendment violation, and thus that plaintiff failed to establish an excessive force claim.  See Graham, 490 U.S. at 397.  Baskin's proofs, viewed most favorably to him, are simply too slim to put in issue the reasonableness of the detective's use of deadly force at the moment the shot was fired, when viewed, as required, from the perspective of a reasonable police officer on the scene and not with the benefit of 20/20 hindsight "in the peace of a judge's chambers."  Id. at 396-97 (quotation omitted); see also Saucier, 533 U.S. at 209-12 (Ginsberg, J., concurring).

If that analysis is incorrect, and Martinez violated Baskin's Fourth Amendment rights, I am not convinced the majority has correctly concluded the "contours of the right" were "sufficiently clear" that a reasonable officer in Detective Martinez's position would understand that shooting Baskin was unlawful.  Creighton, 483 U.S. at 640.  The majority has "failed to identify a case where an officer acting under similar circumstances as [Detective Martinez] was held to have violated the Fourth Amendment."  White v. Pauly, 580 U.S. __, 137 S. Ct. 548, 552 (2017).  Instead, it identifies "the specific constitutional right at issue [as] the Fourth Amendment right to be free from excessive force."  Ante at 12.

13

The United States Supreme Court, however, has repeatedly admonished that "'clearly established law' should not be defined 'at a high level of generality'" but "must instead be 'particularized' to the facts of the case." White, 137 S. Ct. at 552 (quoting al-Kidd, 563 U.S. at 742 and Creighton, 483 U.S. at 640); see also City & County of San Francisco v. Sheehan, 575 U.S. __, 135 S. Ct. 1765, 1776 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix v. Luna, 577 U.S. __, 136 S. Ct. 305, 308 (2015) (quoting al-Kidd, 563 U.S. at 742). "The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Wesby, slip op. at 14 (quoting Saucier, 533 U.S. at 202). Our own Supreme Court has recently echoed those concerns in a case granting qualified immunity to State Troopers seizing a home for the purposes of securing it pending a search warrant. See Brown, 230 N.J. at 106-09.

I am unaware of any clearly established law that suggests that an officer whose police car has been rammed by a driver fleeing a car stop who escapes

14

on foot, and who the officer sees with a gun in his hand just before he runs around a blind corner, must himself, as he rounds that same corner in pursuit, refrain from firing his service weapon as the driver turns toward him until he can clearly see the driver has discarded the gun he held moments before. Accordingly, I cannot find Baskin's right to be free from deadly force under the circumstances of this case was clearly established, even if Detective Martinez's use of force violated the Fourth Amendment.

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson, 555 U.S. at 231 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). It is designed to "provide[] ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). As it is clear to me on the undisputed facts in the record, viewed most favorably to Baskin, that Detective Martinez does not fall into either category, I would affirm the summary judgment in his favor. I would likewise affirm the summary judgment to the City of Camden and its former Chief of Police under Monell v. Department of Social Services, 436 U.S. 658, 691 (1978), based on Baskin's failure to prove a deprivation of his rights.

15

This was not a case representing one of those "incidents in which unarmed men allegedly reach for empty waistbands when facing armed officers."  Salazar-Limon v. City of Houston, 581 U.S. __, 137 S. Ct. 1277, 1282 n.2 (2017) (Sotomayor, J., dissenting).  Because I believe the majority errs in treating it as one, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION